# United States Court of Appeals
## For the Eighth Circuit

_____

No. 17-3057
_____

United States of America

*Plaintiff - Appellee*

v.

William Clarett

*Defendant - Appellant*

_____

Appeal from United States District Court
for the Eastern District of Missouri - St. Louis

_____

Submitted: September 28, 2018
Filed: November 6, 2018

_____

Before WOLLMAN, KELLY, and ERICKSON, Circuit Judges.

_____

ERICKSON, Circuit Judge.

William Clarett was convicted of conspiracy to commit, and use of a facility of interstate commerce in the commission of, murder for hire in violation of 18 U.S.C. § 1958(a). He appeals the district court's refusal to give an entrapment instruction. We affirm.[1]

_____

[1]The Honorable Audrey G. Fleissig, United States District Judge for the Eastern District of Missouri.

## I.    Background

In 2015, Travis Hayden was murdered in St. Louis County, Missouri. Shamonique Wilson, the sole eyewitness, identified William Clarett as the murderer. Clarett was charged with Hayden's murder and, while awaiting trial in the St. Louis County Jail, he reunited with Derek Petty, a high school friend who was awaiting trial on unrelated federal charges.  Petty had previously given an unfruitful proffer interview that earned him no leniency from the government.  Unbeknownst to Clarett, Petty was hoping to acquire  information on other inmates with a goal of obtaining leniency.

According to Petty's trial testimony, Clarett frequently discussed his case with Petty, including his plans to have Wilson killed.  Clarett told Petty that he had unsuccessfully recruited two people to "get at" Wilson, and was looking to hire someone else to do the job.  Petty suggested to Clarett that he might know somebody who could do it and Clarett expressed interest.  At some point after this conversation Clarett handed Petty a scrap of paper with Shamonique Wilson's name handwritten on it.

Petty then wrote to the Assistant United States Attorney prosecuting his case, relating what he had learned about Clarett and his plan to do away with Wilson.  The government offered  Petty another chance to proffer during which he turned over the scrap of paper with Wilson's name on it.  Petty suggested that the government should set up a sting against Clarett using Detective Jordan Exum.  Petty knew Det. Exum from his involvement in Petty's case.  Petty worked with Exum to create a credible back-story explaining their fabricated relationship.  Petty also agreed to put Clarett in touch with Exum via a wiretapped cellphone.  After receiving the cellphone, Petty made two calls to Exum with Clarett participating.  During the first call, Petty simply introduced Clarett, who then proceeded to have a coded conversation about putting

Exum in touch with an outside accomplice. During the second call, Petty provided Exum with the telephone number for the accomplice, then handed the phone to Clarett who confirmed (again in code) that the accomplice had information related to Shamonique Wilson's location.

During the next two weeks, Clarett had several conversations with Exum, the purpose of which was to ostensibly arrange Wilson's murder. These conversations took place both by jailhouse phone calls and in person. Clarett eventually paid Exum $510 as a down-payment, offered to provide a high-powered rifle, and suggested that he and Exum should hang out after Clarett's release. During the final planning Clarett opted to have the body displayed "in a trophy case" as an example for all to see. Based on these activities Clarett was charged with Conspiracy to Commit Murder-For-Hire in July of 2016.

At trial, Clarett did not present a defense case other than by cross-examination. He did not testify, call witnesses, or present any evidence. Clarett's sole defense was that he had been entrapped by Derek Petty, who he asserted was a *de facto* government agent from the start. Clarett requested that the court instruct the jury on entrapment consistent with Model 8th Circuit Criminal Instruction 9.01 – Entrapment. The district court declined to instruct the jury on entrapment because it believed that there was insufficient evidence to raise a jury question that Derek Petty was a government agent. The court also found no evidence of inducement by Petty. Finally, the court suggested that Clarett was predisposed to hire someone to murder Wilson.

## II.    Discussion

We review the denial of a requested instruction on entrapment *de novo*. United States v. Wynn, 827 F.3d 778, 786 (8th Cir. 2016). A defendant is entitled to an entrapment instruction only if "there is sufficient evidence from which a reasonable

jury could find entrapment." United States v. Young, 613 F.3d 735, 746 (8th Cir. 2010)(quoting Mathews v. United States, 485 U.S. 58, 62 (1988)).

"[A] valid entrapment defense has two related elements: government inducement of the crime, and a lack of predisposition on the part of the defendant to engage in the criminal conduct." 485 U.S. at 63. "Inducement may take different forms, including pressure, assurances that a person is not doing anything wrong, persuasion, fraudulent representations, threats, coercive tactics, harassment, promises of reward, or pleas based on need, sympathy, or friendship." United States v. Stanton, 973 F.2d 608, 610 (8th Cir. 1992)(quotations omitted). It consists of more than just providing an opportunity to break the law. Id.

While entrapment cases do not typically turn on whether any inducement was at the hands of a government agent or a private entity, that question is at the heart of this case. In order for a person to be a government agent for entrapment purposes the person must have authority to act for the government. The deceptive nature of sting operations precludes apparent authority, leaving only actual authority for consideration. "Whether express or implied, actual authority requires action by the principal." Schaffart v. ONEOK, Inc., 686 F.3d 461, 471 (8th Cir. 2012). Clarett argues that Petty was a *de facto* government agent from the very start of the discussions between Petty and Clarett. Clarett points to Petty's urgent need to ingratiate himself with the government to obtain a sentence reduction for cooperation. He asserts that because the potential for cooperation was open that Petty had "terms of cooperation,"[2] and that Petty may have believed he had an ongoing agreement with the government before his first interaction with Clarett. Even if we assume them to

_____

[2]The phrase originates from Petty's May 2016 letter to prosecutors, wherein Petty stated that he had "been working nonstop trying to keep [his] terms of cooperation open because [he] truly need[s] some relief." (Tr. Vol. II, p. 40; Gov. Exh. 3). Until his second proffer interview, there is no other evidence of any arrangement between Petty and the government. Petty clarified at trial that he "never really agreed to any terms," id. at 53, which is consistent with the record.

be true, none of these circumstances, alone or in aggregate, could support the jury finding that Petty was acting on behalf of the government from the outset of his communications with Clarett.

We note that there *was* government action after Petty's second proffer interview: Petty was issued a wiretapped cellphone and was tasked with introducing Clarett to an undercover agent. However, the two wiretapped cellphone conversations constitute the entirety of his conduct on record from this point onward. Nothing during these two conversations indicates that Petty did anything more than provide Clarett with the opportunity to break the law. Whether or not Petty induced Clarett to engage in the murder-for-hire plot *before* this point is simply irrelevant because Petty was then acting on his own and not on behalf of the government. Because Clarett was not induced by a government agent, we need not consider whether he was predisposed to commit the crime of which he was convicted.

## III.   Conclusion

For the foregoing reasons, we affirm the judgment of the district court.

_____